NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DANIELLE M., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, T.M., *Appellees.*

No. 1 CA-JV 17-0436
FILED 3-15-2018

Appeal from the Superior Court in Navajo County
No. S0900JD201500040
The Honorable Michala M. Ruechel, Judge

**AFFIRMED**

COUNSEL

Law Office of George Hess PLLC, Pinetop
By George R. Hess
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**H O W E**, Judge:

¶1        Danielle M. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, T.M., on the grounds of neglect and court-ordered out-of-home placement for a cumulative period of 15 months or longer. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        The Department has been involved in Mother's life since 2000, and Mother's parental rights to three of her five children have been terminated, and a fourth child lives with that child's father. In November 2015, the Department received a report that Mother let drug users move into her home, T.M. asked neighbors for food, and T.M. appeared dirty and inappropriately dressed for the environment. A Department caseworker visited Mother's home, but Mother refused to talk to her or let her see the home. The caseworker was able to see from the doorway that the apartment was cluttered with clothes and trash. She also learned from the leasing office that Mother might be evicted because of her unsanitary home. That same day, the caseworker met with T.M. at her elementary school and noted that T.M. wore clothes too big for her, had dirty hair, and was not wearing a coat or socks on a "cool" day. T.M. stated that she did not have enough food at home and described the food as "nasty." She explained that the food was nasty because she would sometimes find it under the clutter at home. T.M. also reported that she hid in her room when "all the people" came over, Mother took "lots of pills and capsules," and Mother did not work because she slept often.

¶3        As a result, the Department removed T.M. from Mother's care in November 2015. Mother yelled profanities at the caseworker and threatened her, threatened to kill herself, and a sheriff's deputy had to restrain Mother. The caseworker observed that Mother appeared to be under the influence of substances. The Department petitioned for dependency, alleging that Mother had neglected T.M. due to unsanitary living conditions, poor supervision, and substance abuse. Mother did not

appear at the pretrial conference and was deemed to have admitted the allegations in the petition. The court subsequently found T.M. dependent with respect to Mother.

¶4        In January 2016, Mother participated in a psychological evaluation. Mother reported that she started using illegal substances at age 14, and she had consumed alcohol, marijuana, acid, and methamphetamine "all the time," but no longer did so. She also stated that she took oxycodone daily for four years and then later underwent "methadone treatment for 3 weeks to get off oxy." Mother also reported taking psychotropic medications to manage various mental illnesses. She stated that she had participated in mental-health services, but they were not effective. Mother further stated that she was attending counseling once a week. Additionally, Mother reported that all five fathers of her children had been physically and emotionally abusive. She highlighted that one partner would "slice his neck" and bleed "just to control [her]." Mother also reported that she was on a waiting list for low-income housing and that she received $50 in food stamps and $733 in social security disability income.

¶5        The psychologist diagnosed Mother with avoidant personality disorder with self-defeating and histrionic features, generalized anxiety disorder, posttraumatic stress disorder ("PTSD"), attention-deficit hyperactivity disorder ("ADHD"), and an opioid-use disorder, severe. She opined that Mother had "social skills deficits, weak coping skills, and an avoidant general style of behavior." She further opined that Mother lacked insight and self-awareness and was "preoccupied with herself, her insecurities[,] and her various anxieties." The psychologist also stated that "individuals with self-defeating traits choose people and situations where they experience the same disappointments and mistreatment over and over[,]" and she highlighted Mother's abusive relationships as an example. She concluded that Mother's mental-health issues were severe and that Mother was unlikely to make enough progress to safely parent T.M., and any child left in Mother's care would be at a high risk for abuse and neglect. Therefore, she encouraged the Department to reconsider whether reunification remained a viable option. If the case plan remained reunification, she recommended that the Department continue to offer visitation, parent-aide services, and counseling.

¶6        From January to June, the Department referred Mother for various services, including a substance-abuse assessment and treatment, drug testing, parent-aide services, counseling, visitation, and transportation. But Mother's participation in these services was poor. Although the Department referred Mother for individual counseling and

substance-abuse counseling at an agency, Mother did not participate in any sessions. Mother's initial referral for the substance-abuse assessment and treatment ended due to her non-compliance. Although Mother did produce some negative drug test results, she also gave diluted test results and missed many testing dates. Moreover, Mother missed many scheduled visits with T.M. and did not attend most of her parent-aide sessions. Subsequently, Mother's parent-aide services ended. During this period, Mother claimed that she suffered from various health issues, including chicken pox, blood clots, and a methicillin-resistant staphylococcus aureus ("MRSA") infection and therefore could not participate in visits. While discussing the MRSA issue with parent-aide services, Mother stated that she had recently gotten engaged. Concerning Mother's housing at this time, she went from living in an apartment with a violent roommate, to living in a car, and later to living in a trailer with no running water or heat.

¶7        In late August, Mother was medically cleared of MRSA, and the Department re-referred her for parent-aide services. The Department also referred Mother to ChangePoint Integrated Health for individual counseling and psychiatric services where she later completed a behavioral-health intake assessment. But Mother then canceled her first appointment for counseling and also canceled her pre-psychiatric evaluation. At this time, Mother and her new fiancé were living in a shelter.

¶8        From September through November, Mother improved on her poor participation in visits, but she continued to miss most of her one-on-one parenting sessions. Despite being re-referred for a substance-abuse assessment and treatment in October, she failed to consistently drug test, and on dates that she did test, she sometimes produced diluted test results. At this time, Mother moved from the shelter to a motel room that her church paid for, and then into an apartment with her fiancé. In October, however, Mother kicked her fiancé out of the apartment because he was verbally abusive, and she also left the apartment because of bed bugs. But later that month, Mother and her fiancé got back together and started living out of a car and panhandling in front of a store. Mother also informed a parent aide in November that she was working with doctors to balance out her medications so that she would not need to take narcotics because she did not want to abuse prescription drugs again. She also stated that if she did not get custody of T.M., she would do "all kinds of drugs."

¶9        From December 2016 to February 2017, Mother's participation in supervised visits started to lapse, and she attended only about half of her visits. During this period, she completed a psychiatric evaluation at ChangePoint. The ChangePoint psychiatrist diagnosed

Mother with ADHD, combined type; PTSD, unspecified; and other stimulant abuse, uncomplicated. The ChangePoint psychiatrist then prescribed Mother methylphenidate ("Ritalin") to manage her ADHD. In February, Mother moved into a domestic-violence shelter and started to receive services from ChangePoint. During a Team Decision Making meeting, Mother stated that the Ritalin had a positive effect on her and that she would no longer self-medicate with other drugs and no longer needed substance-abuse treatment.

¶10        In March, the juvenile court changed T.M.'s case plan to severance and adoption, and the Department moved to terminate Mother's parental rights. The Department alleged that Mother had neglected T.M. under A.R.S. § 8–533(B)(2), was unable to discharge her parental responsibilities due to a history of chronic substance abuse under A.R.S. § 8–533(B)(3), and was unable to remedy the circumstances that caused T.M. to remain in an out-of-home placement for 15 months or longer under A.R.S. § 8–533(B)(8)(c).

¶11        In April, Mother moved into a sober-living apartment. She completed a seriously mentally ill ("SMI") assessment and reported that she had anxiety, fatigue, difficulty concentrating, and sleeping issues. She also stated that her decision-making skills were questionable and was struggling to "keep things together." Crisis Response Network reviewed Mother's assessment and concluded that she was eligible for SMI services. The assessment diagnosed Mother with a major depressive disorder, recurrent and moderate; PTSD; ADHD; stimulant-use disorder, amphetamine type, moderate to severe, in sustained remission; opioid-use disorder, severe, in sustained remission; and alcohol-use disorder, mild.

¶12        At the severance hearing in May, Mother testified that she was currently living at a sober-living apartment and was looking to move into SMI housing through ChangePoint or Section 8 housing. She also testified to receiving social security disability income, services through ChangePoint, and food boxes from her church. Although Mother stated that the services were helpful, she thought that she could be self-sufficient without these services.

¶13        Mother's clinician at ChangePoint testified that she was providing Mother with counseling to help manage her anxiety, depression, ADHD, and PTSD. The clinician also testified that Mother's engagement in services improved after she started her ADHD treatment with her and that Mother had moved in a positive direction over the last four to five months. In contrast, the psychologist from Mother's January 2016 evaluation

5

testified that if Mother had started to engage in intense therapy in February, she likely did not sufficiently address her mental-health issues by trial. She opined that personality dysfunctions can take years to overcome and that Mother would have needed at least a year of intense therapy to address her mental-health issues. She also testified that Mother's SMI assessment indicated that Mother was unable to parent her child, form stable relationships, remain sober, or respond to treatment.

¶14        Mother's case manager testified that Mother was at risk for a relapse based on her many missed drug tests. The case manager also stated that Mother had poor relationships with men, and she highlighted one instance where Mother had attempted to get away from a violent partner, yet they ended up reconciling. She opined that because Mother needs "a huge support team to manage her day-to-day life," Mother would not be able to care for T.M. The case manager noted that although Mother's attendance at visits with T.M. had relatively improved, she was still missing visits. She also opined that Mother was unable to place T.M.'s needs above her own, so the current circumstances did not warrant reverting the case plan back to reunification. The case manager testified that an adoptive home had been identified and that the home met T.M.'s physical, social, educational, medical, psychological, and emotional needs. She also stated that terminating Mother's parental rights would benefit T.M. because it would provide her with a stable and drug-free home. She opined that T.M. would be harmed if Mother's rights were not terminated because of Mother's unstable housing, violent relationships with men, and potential relapse. Lastly, a Department program manager testified that she was involved in cases regarding Mother's other children. The program manager testified that Mother engaged in the same participation pattern, in which once a motion to terminate her parental rights was filed, Mother participated in services more than she had during the months before that point.

¶15        The court terminated Mother's parental rights to T.M. on the grounds of neglect and court-ordered out-of-home placement for a cumulative period of 15 months or longer. Under the neglect ground, the court found that Mother allowed T.M. to live in a cluttered home, to wander the apartment complex unsupervised, to wear inadequate clothing, and to eat inadequate food. Under the 15 months' out-of-home placement ground, the court found that T.M. had been in an out-of-home placement for 15 months or more, the Department had made diligent efforts to provide appropriate reunification services, Mother had been unable to remedy the circumstances that caused T.M. to be in an out-of-home placement, and a substantial likelihood existed that Mother would not be capable of

exercising proper and effective parental care and control in the near future. The court further found that terminating Mother's parental rights was in T.M.'s best interests because it would further the plan of adoption and provide permanency and stability, T.M. was residing in an adoptive placement that met all her needs, and she was otherwise adoptable if the current placement could not adopt her.

## DISCUSSION

¶16 Mother argues that insufficient evidence supports the court's finding that a substantial likelihood existed that Mother would be unable to parent T.M. in the near future. She also contends that the juvenile court erred by terminating her parental rights because the Department did not make diligent efforts to provide appropriate reunification services. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). Additionally, we accept the juvenile court's factual findings unless no reasonable evidence supports them and will affirm a severance order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1 (App. 2008).

¶17 To terminate parental rights, the juvenile court must find by clear and convincing evidence the existence of at least one statutory ground under A.R.S. § 8−533 and by a preponderance of the evidence that termination would be in the child's best interests. A.R.S. § 8–533(B); Ariz. R.P. Juv. Ct. 66(C). If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court terminated parental rights, we need not address claims pertaining to the other grounds.[1] *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 3 (App. 2002).

¶18 As pertinent here, to terminate parental rights for 15 months in an out-of-home placement, the juvenile court must find by clear and convincing evidence that: (1) the Department made diligent efforts to provide appropriate reunification services, (2) the child has been in an out-of-home placement for a cumulative total period of 15 months or longer pursuant to court order, (3) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement, and (4) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future.

---

[1] Because we find that the court did not abuse its discretion by terminating Mother's parental rights under the 15 months' out-of-home placement ground, we need not address the neglect ground.

A.R.S. § 8–533(B)(8)(c); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005). Moreover, the juvenile court must find by a preponderance of the evidence that severance is in the child's best interests. *Kent K.*, 210 Ariz. at 288 ¶ 41. A finding that severance is in the child's best interests may be based on a showing that a current adoptive plan exists or that the child is adoptable, and the current placement is meeting the child's needs. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50 ¶ 19 (App. 2004). Additionally, terminating the relationship is in the child's best interests if the child would be harmed if the relationship continued or would benefit from the termination. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 16 (2016).

**¶19** Sufficient evidence supports the court's order terminating Mother's parental rights. T.M. had been in an out-of-home placement for about 18 months. The Department offered Mother various services, including substance-abuse assessment and treatment, drug testing, a psychological evaluation, a psychiatric evaluation, psychiatric medication, counseling, SMI services, two parent-aide referrals, parenting classes, and transportation assistance. But Mother was unable to remedy her mental illnesses, maintain stable housing, or meet T.M.'s basic needs. The psychologist testified that Mother's SMI assessment indicated that Mother could not parent her child, remain sober, or form stable relationships. Likewise, Mother's case manager testified that Mother required several support systems just to manage her own day-to-day needs, and thus, would not be able to meet T.M.'s needs. The case manager also opined that Mother continued to place her needs above T.M.'s and continued to miss visits. Although Mother was in a sober-living apartment, her housing history before trial was unstable.

**¶20** Mother counters that the Department's arguments were based on her poor participation earlier in the dependency rather than her actions over the last five months before the hearing, in which she showed improvement in her participation after receiving ADHD treatment. Even with her recent improvement, however, the psychologist opined that Mother's mental illnesses would require at least a year of intense therapy before she could safely parent T.M. In that case, T.M. would have to wait at least another seven months to see the results of Mother's treatment. Moreover, Mother's recent improvement over the last 5 months does not excuse her lack of participation the previous 13 months. Furthermore, the court did not err by discounting Mother's belated efforts in light of her pattern of participation in services with her other children. Consequently, the record reflected a substantial likelihood that Mother would be incapable of exercising proper and effective parental care and control in the near future.

**¶21** Mother also argues that the Department failed to make diligent efforts to provide appropriate reunification services because it did not give her adequate time to participate in those services. In particular, she claims that the Department did not provide her with a psychiatric evaluation until January 2017, after which she claims that she was diagnosed for ADHD "for the first time" and that the Department was therefore "obligated" to provide her with additional treatment time.

**¶22** The record shows, however, that the Department offered Mother various services, and she had poor participation during the first 13 months. Contrary to Mother's claim, Mother received her first diagnosis of ADHD when the psychologist evaluated her in January 2016, rather than January 2017. The psychologist opined that Mother's personality and anxiety disorders were the primary issues preventing her from parenting T.M., and thus, recommended that Mother participate in therapy for those issues. But Mother failed to participate in the offered behavioral-health services over the next seven months. Additionally, she did not attend an August 2016 pre-psychiatric evaluation for additional behavioral-health services. Not until January 2017, five months later, did Mother complete a psychiatric evaluation. Although Mother is correct that her participation improved over the last five months, she still faced many hurdles to safely parent T.M. Most significantly, she still faced at least another seven months of intensive therapy, which would have extended T.M.'s out-of-home placement to at least 25 months. Thus, the court did not abuse its discretion by finding that the Department provided appropriate reunification services and adequate time to participate in those services.

**¶23** Further, while Mother does not challenge the juvenile court's best interests finding on appeal, the record supports the court's finding that T.M. would benefit from the termination of Mother's parental rights. The case manager testified that T.M. was adoptable, in an adoptive placement meeting her needs, and her adoption would give her a stable and drug-free home. In contrast, the case manager testified that if Mother's rights were not terminated, T.M. could potentially be harmed because of Mother's unstable housing, relationships involving domestic violence, and potential relapse. Thus, the juvenile court did not abuse its discretion by finding termination to be in T.M.'s best interests.

**CONCLUSION**

¶24 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA